**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 14-cr-424 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| JINHUANG ZHENG, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendants Jinhuang Zheng ("Zheng") and Mingrui Sun ("Sun") are charged with conspiracy to commit extortion and the use of extortionate means to collect and attempt to collect an extension of credit in violation of 18 U.S.C. § 894(a)(1) (Count One) and knowingly participating in the use of extortionate means to collect and attempt to collect an extension of credit also in violation of 18 U.S.C. § 894(a)(1) (Count Two). Before the Court are (1) various motions *in limine* filed by the Government in one consolidated document [149], (2) Sun's sur-reply [259] and associated exhibit on the issue of whether he should be allowed to present a coercion or duress defense to the jury, which the Court construes as a motion to present the defense, (3) the Government's *Santiago* proffer [151], and (4) Zheng's motion *in limine* to preclude evidence of severity of injuries [194].

For the reasons stated below, the Court grants in part, denies in part, and reserves ruling in part on the Government's motions *in limine* [149]. More specifically, the Court grants the motions as to arguments directed to jury nullification and Defendants' character for lawfulness (subject to the caveats and line-drawing discussed below) and denies the Government's motion to preclude Sun's coercion defense, concluding that Sun's proffer [259] adequately demonstrates

his entitlement to present the defense. The Court reserves ruling on the remainder of the Government's motions. The Court accepts the Government's *Santiago* proffer [151], as to which no objections have been filed. Finally, the Court denies Zheng's motion to preclude evidence of the severity of injuries [194].

## I.      Background

On November 20, 2014, Zheng, Sun, and four co-defendants were charged in a two-count indictment [35] with conspiracy to commit extortion and the use of extortionate means to collect an extension of credit in violation of 18 U.S.C. § 894(a)(1). According to the indictment, Zheng was an owner and employee of Company A. Prior to June 1, 2014, Victim A was an employee of Restaurant A, and Restaurant A owed a debt to Company A for approximately $40,000 worth of goods pursuant to a line of credit. In May 2014, Zheng informed co-defendant Sheng Quan Dong ("Dong") of the outstanding debt owed to Company A. Zheng and Dong recruited Sun and co-defendants Bing Liang Chen ("Chen") and Daniel Zhu ("Zhu") to help collect the debt from Victim A through the use of violence and threats of violence. On June 1, 2014, Zheng, Sun, and three of the co-defendants traveled to Restaurant B in Aurora, Illinois, where Victim A was then an employee. While inside the restaurant, Zheng confronted Victim A and demanded that he pay the debt. When Victim A refused, Zheng, Sun, and the three co-defendants present attacked and physically assaulted him. After the attack, Chen recruited an additional co-defendant, Jack Wu ("Wu"), to help him make further threats against Victim A and to intimidate him into paying the debt.

Dong, Chen, Zhu, and Wu have entered guilty pleas to the charges brought against them. Zheng and Sun are set to be tried by a jury on August 14, 2017. In advance of trial, the Government has moved for the exclusion of a number of categories of evidence, the admission of

business records and certified copies of public documents, and permission to recall a witness throughout trial.  See [149].  Zheng's response, as a general matter, urges the denial of the Government's motion on the grounds that the motion merely sets out settled rules for trial: "Defense counsel in this case is [a] seasoned trial attorney and is familiar with proper courtroom procedures, and the rules of evidence. * * * The Defense has no doubt that this Court will control the courtroom and ought to reserve ruling until the addressed points are raised at trial."  [198] at 1–2.  The Court agrees in large part with Zheng, and thus a majority of the issues will be reserved for trial on the understanding that all counsel comprehend and will adhere to the rules. As to other matters, the issues are ripe for decision and the Court believes that some guidance may facilitate the smooth presentation of the evidence at trial.

## II.    Legal Standard

"Trial courts issue rulings on motions *in limine* to guide the parties on what evidence it will admit later in trial."  *Perry v. City of Chicago*, 733 F.3d 248, 252 (7th Cir. 2013).  The party seeking to exclude evidence "has the burden of establishing the evidence is not admissible for any purpose."  *Mason v. City of Chicago*, 631 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009); see also *Jonasson v. Lutheran Child & Family Svcs.*, 115 F.3d 436, 440 (7th Cir. 1997).  As the trial progresses, the Court "remains free to alter earlier rulings" on motions *in limine*.  *Perry*, 733 F.3d at 252; see also *Luce v. United States*, 469 U.S. 38, 41–42 (1984) ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling.").  "Furthermore, the court may defer ruling on a motion *in limine* until trial if the parties' arguments 'cannot be evaluated accurately or sufficiently * * * in such a procedural environment.'"  *United States v. Mandell*, 2014 WL 464226, at *2 (N.D. Ill. Feb. 3, 2014) (quoting *Jonasson*, 115 F.3d at 440).  Although motions *in limine* typically address

evidentiary matters, they may also relate to other matters, such as affirmative defenses and proper lines of inquiry at trial. *United States v. Boender*, 2010 WL 811296, at *1 (N.D. Ill. Mar. 3, 2010) (citations omitted).

### III. The Government's Motions *In Limine* [149]

The Government moves to preclude evidence or argument: (1) designed to elicit jury nullification, (2) concerning the Defendants' characters for lawfulness, (3) regarding discovery, (4) explaining or defining reasonable doubt, (5) commenting on the Court's evidentiary rulings, and (6) concerning a coercion or duress defense. In addition to these requests to exclude evidence, the Government also asks the Court to (7) prohibit cross examination outside of the scope of Federal Rules of Evidence 608(B) and 609, (8) admit evidence offered pursuant to Federal Rule of Evidence 803(6) and 902(11), (9) admit certified copies of public records, and (10) recall a specific witness, Special Agent David Patch, throughout trial pursuant to Federal Rule of Evidence 611(A). Both Defendants filed limited responses.

As an initial matter, in view of the absence of any objection and to streamline the presentation of the evidence, the Court admits the Government's evidence offered pursuant to Federal Rules of Evidence 803(6) and 902(11) and the certified copies of public records. In addition, pursuant to Rule 611, the Court will permit the Government to recall Special Agent Patch as it has proposed. The Court also addresses below the parties' arguments on (1) jury nullification evidence, (2) evidence concerning Defendants' characters for lawfulness, and (3) Sun's coercion defense. In regard to the remainder of the Government's requests, counsel have agreed—and are required—to abide by the Federal Rules of Evidence. Accordingly, the Court reserves ruling on such items unless and until a specific ruling becomes necessary at trial.

Should either Defendant intend to present evidence or argument in any of the categories covered by the Government's motions, defense counsel should notify the Court in advance.

### A.      Motion to Bar Evidence or Argument Designed to Elicit Jury Nullification

The Government first moves to bar the introduction of evidence or argument designed to elicit jury nullification.  In particular, the Government seeks to exclude evidence concerning the Defendants' (a) age, family needs, and immigration status; (b) the penalties Defendants' face if convicted; and (c) the motivation for investigating or prosecuting this case.

Jury nullification occurs when a jury acquits a criminal defendant even though it has found that the Government has met its burden of proof.  See *United States v. Rainone*, 2013 WL 389004, at *1 (N.D. Ill. Jan. 31, 2013).  Neither the court nor counsel should encourage jurors to exercise nullification power, and the Court may preclude defense attorneys from any attempts to present evidence or argument in favor of nullification.  *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996).

### 1.      Defendants' Age, Family Needs, or Immigration Status

The government requests that the Court preclude Defendants from introducing evidence about their age, family needs, or immigration status "so as to infer them as the reason for the defendants' criminal conduct or to invoke sympathies regarding the impact of a conviction upon the defendants or their families."  [149] at 3.  Zheng has represented that he does not plan to introduce evidence or pursue a line of question along these lines.  See [198] at 3.

Sun, however, objects to this request and argues that he has a "right to let the jury know who he is."  See [152] at 2.  This argument does not respond directly to the Government's motion, which seeks to preclude certain background evidence used for the specific purposes of implying a motive or excuse for the Defendants' criminal conduct or invoking sympathies regarding the financial and/or emotional effect a conviction will have on Defendants' families.

Evidence offered for these purposes is improper.  See *United States v. Henderson*, 2012 WL 698796, at *2 (N.D. Ill. Mar. 2, 2012) ("Argument or evidence relating a defendant's family needs is not admissible to infer a motive or an excuse for [a] defendant's criminal conduct or to invoke sympathies regarding the impact of a conviction upon a defendant's family."); *United States v. Johnson*, 2011 WL 809194, at *4 (N.D. Ill. Mar. 2, 2011) (granting the government's motion to exclude evidence of family needs); *United States v. Shields*, 1991 WL 236492, at *4 (N.D. Ill. Aug. 13, 1991) ("The defendants may present testimony establishing that they have families.  However, the Court will not allow such testimony to be presented in detail, nor will the Court permit any testimony regarding the possible impact which a conviction might have upon any family member.").  There is a line between introducing a party or witness, which provides context for the testimony that follows and can have a humanizing effect for the jury, and pandering to a jury by eliciting testimony or presenting argument for the purpose of offering a motive or excuse for unlawful conduct or exposing the jury to the hardship that the defendant's family will face if he is convicted.  The former is permissible; the latter is not.  The Court expects counsel to do their best to stay within these bounds and will sustain objections to the extent that they do not.

### 2.    Penalties Faced by Defendants

The Government next argues that Defendants should not be able to introduce evidence, make argument, or otherwise mention "the potential penalties faced by a defendant."  [149] at 4.  Only Zheng has responded to this motion, stating that he does not intend to introduce evidence or argument to this effect.  [198] at 3.  Zheng, however, does seek to ensure that the potential penalties that his co-defendants would have faced remain on the table as potential impeachment evidence.  *Id.*  Based on the understanding of the parties as reflected in their briefs, the

Government's motion *in limine* is granted.  However, this ruling does not preclude Defendants from fully cross examining any government witnesses about penalties that they may face and benefits that they have received—or may receive—from the Government, including whether they were immunized or promised leniency.

### 3.      Government's Motivation

As a final category of potential jury nullification evidence, the Government seeks to exclude evidence bearing on its decision to prosecute.  Sun has not responded to this motion; Zheng has stated that he does not intend to question the government's motivation for investigating or prosecuting this case.  See [198] at 4.  Accordingly, this unopposed portion of the Government's motion *in limine* is granted.

### B.      Motion to Bar Evidence or Argument of Defendants' Character for Lawfulness

The Government also moves to preclude Defendants from offering evidence of their lawfulness, non-corrupt conduct, and prior good acts *except for* reputation or opinion evidence offered by character witnesses pursuant to Federal Rule of Evidence 405(a).  See [149] at 5–6.

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  Fed. R. Evid. 404(a)(1).  Similarly, "[e]vidence of a crime, wrong, or other act" (including "good" acts, see *United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994)), "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Such evidence may be admissible, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  The Seventh Circuit has

opined that Rule 404(b) "proscribes the admission" of "character evidence offered to prove that [the defendant] had a good character and acted in conformity therewith." *Hill*, 40 F.3d at 168.

"When evidence of a person's character or character trait is admissible" for some proper purpose, "it may be proved by testimony about the person's reputation or by testimony in the form of an opinion." Fed. R. Evid. 405(a). "On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct." *Id*. For example, in *Hill*, the Seventh Circuit held that evidence that a defendant charged with mail theft and forgery did not take "test letters" sent by investigators was not admissible to show her character trait for law-abidingness, even if law-abidingness was a pertinent character trait for the charged crimes, because that trait was only provable under Rule 405 by reputation evidence, not by specific instances in which she abided by the law. *Hill*, 40 F.3d at 168–69; see also *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012) ("Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment."); *United States v. Santos*, 65 F. Supp. 2d 802, 845–46 (N.D. Ill. 1999) ("[a] defendant may not seek to establish his [or her] innocence * * * through proof of the absence of criminal acts on specific occasions") (internal quotation marks and citation admitted).

Based on Rule 405(a) and the foregoing precedent, the Court grants the Government's motion *in limine*. To the extent any Defendant seeks to introduce evidence of specific incidences of good acts or non-corrupt conduct, he should first inform the Court outside of the presence of the jury. Such evidence will not be admitted unless: (1) Defendant has demonstrated that the evidence is admissible for some purpose other than as evidence that Defendant acted in conformity therewith; and (2) Defendant has offered the evidence through testimony about Defendant's reputation or testimony in the form of an opinion pursuant to Rule 405(a).

Of particular note, Zheng has expressed his intention to introduce evidence that he "is a legitimate business owner—as opposed to a criminal mastermind." Zheng argues that this evidence is relevant—not as character evidence—but as general background information and as a rebuttal to the Government's contentions that he acted with the requisite criminal intent. See [198] at 4–5. As with the other evidence of Zheng's background discussed above, this issue requires a nuanced approach. The Court agrees with Zheng that (1) evidence regarding Zheng's occupational history and (2) evidence of lawful business dealings may be relevant. But, depending on how the evidence is presented and argued, counsel may veer into improper propensity evidence. All that the Court can do in the abstract is to note the line between the permissible and impermissible and reserve for trial rulings as needed on the specifics.

### C. Defendant Sun's Coercion Defense

The Government also asks this Court to preclude Sun from offering evidence or argument of coercion or duress "unless or until the defendant proffers sufficient evidence to support such a defense." See [149] at 9. The case law holds that an evidentiary proffer is appropriate to identify a coercion or duress defense at this time and that a coercion defense is an appropriate subject of a motion *in limine*. *United States v. Sahakian*, 453 F.3d 905, 909 (7th Cir. 2006) (district court may evaluate evidence supporting an affirmative defense by way of a motion *in limine* ruling). "The purpose of this gatekeeping mechanism is to only allow defenses that are colorable. If a defense can't rationally be found because it isn't supported by the proffered evidence, then there is no need to ask the jury to assess it." *United States v. Pecina*, 2014 WL 6473424, at *2 (N.D. Ind. Nov. 17, 2014).

In his initial response to the Government's motion, Sun argued that a proffer is an "unconstitutional procedure" and that he would instead present evidence supporting this defense

at trial.  See [152].  Had Sun adhered to this position, he likely would have waived the opportunity to present the defense, as the Seventh Circuit has squarely rejected his constitutional argument.  See *United States v. Tokash*, 282 F.3d 962, 967–68 (7th Cir. 2002).  But Sun eventually changed course and submitted a 28-page transcript from his November 21, 2014 videotaped interview with two FBI detectives as a proffer of evidence supporting a coercion defense.

### 1.        Elements of a Coercion Defense

"The duress defense has its roots in common law, and excuses criminal conduct, even though the defendant engages in it with the requisite *mens rea*, because the defendant nevertheless acted under a threat of a greater immediate harm that could only be avoided by committing the crime charged."  *United States v. Sawyer*, 558 F.3d 705, 710–11 (7th Cir. 2009). The Supreme Court has held that, because coercion is an affirmative defense that "normally does not controvert any of the elements of the offense itself," the defendant bears the burden at trial of proving the elements of the defense by a preponderance of the evidence.  *Dixon v. United States*, 548 U.S. 1, 7–8 (2006).  At this stage, however, as "a prerequisite for presenting the defense of coercion to the jury," the defendant need only produce "sufficient evidence such that a rational jury could infer that he was coerced into committing the crime charged."  *United States v. Toney*, 27 F.3d 1245, 1248 (7th Cir. 1994) (citing *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir. 1991)); see also *Sawyer*, 558 F.3d at 711 (before a court will instruct a jury on the defense, "a defendant need show only a foundation for the elements of the defense in the evidence, not a preponderance of the evidence supporting the defense").  In other words, a defendant "only needs to demonstrate a foundation in evidence, 'however tenuous,' to support his theory, but a 'mere scintilla of evidence * * * is not sufficient to warrant a defense instruction.'"  *United*

*States v. Canady*, 578 F.3d 665, 672–73 (7th Cir. 2009) (quoting *United States v. Buchmeier*, 255 F.3d 415, 427 (7th Cir. 2001)); *see also United States v. Bailey*, 444 U.S. 394, 415 (1980) (pre-trial proffer need only "meet a minimum standard as to each element of the defense"). In reviewing whether there is sufficient evidence for a duress defense, the Court accepts the proffered evidence as true and does not evaluate its credibility. *Bailey*, 444 U.S. at 414–15. Thus, at this pre-trial stage, the Court will assess only whether there is a triable issue as to coercion, *i.e.*, whether Sun has satisfied the requirement that he present a *prima facie* case as to each element of the defense.

A defendant presenting the defense of duress or coercion is required to show that (1) he reasonably feared immediate death or serious bodily harm unless he committed the criminal act with which he was charged, and that (2) there was no reasonable opportunity to refuse to commit the offense and to avoid the threatened injury. *Sawyer*, 558 F.3d at 711 (citing *United States v. Jocic*, 207 F.3d 889, 892 (7th Cir. 2000)). "In other words, the defendant must have been under such duress that he had no alternative but to commit the crime in order to avoid the greater harm." *Toney*, 27 F.3d at 1248.

As to the first element, the Seventh Circuit has long held that the threatened harm giving rise to a duress defense must have been "present, immediate, or impending." *Tanner*, 941 F.2d at 587. In contrast, a claim of "potential future violence" is insufficient to support a duress defense. *United States v. McDowell*, 687 F.3d 904, 911–12 (7th Cir. 2012) (testimony that drug dealer was known for using threats and violence against those who failed to pay was insufficient to establish first element of defense). The threatened harm must also be specific. A "veiled threat of future unspecified harm * * * is not the equivalent of an immediate threat of death or severe bodily injury." *United States v. Patrick*, 542 F.2d 381, 388 (7th Cir. 1976) (citation

omitted) (alteration in original); *United States v. Chi Tong Kuok*, 671 F.3d 931, 948 (9th Cir. 2012) ("vague and undetailed threats will not suffice"). Nor can a defendant maintain a duress defense where he had "a reasonable opportunity to refuse to commit the crimes." *United States v. Robinson*, 663 F.3d 265, 269 (7th Cir. 2011) (defendant had opportunities to refuse to commit crimes during the six-week duration of his contact with the threatening individual).

### 2. The Proffered Evidence

After addressing Sun's *Miranda* rights, the questioning in the November 21, 2014 interview turned to the events of June 1, 2014. Sun described the following sequence of events. Zhu, Sun's "good friend" since elementary school, had called him that afternoon and invited him out to eat. According to Sun, Zhu picked him up in a car and the two went to a restaurant in Chicago's Chinatown neighborhood. After they ate, another man met them in the parking lot; Sun was not familiar with this man. Sun contends that this man said "let's go." When Sun asked where, the man said Indiana. Sun and Zhu then got into the back seat of a silver car; Sun did not know the men in the driver and passenger seats. Sun reported that the men were speaking in Mandarin and English and then in different dialects that he did not understand. According to Sun, at this point, someone asked him why he was tense, and he replied that he was not tense. This same person then tried to "scare" Sun, "saying oh you're gonna die today." The man also said something along the lines of "[h]e didn't buy a house yet or something like that." The transcript is unclear on the details of this statement, although later questioning implies that Zhu was the speaker and he was speaking about Sun.

As the conversation in the car continued, the men started discussing some paperwork in Cantonese, and Sun understood that the men were talking about money, and more specifically

about some unknown sum of money that someone was owed.  Sun then heard discussion in

Mandarin about beating someone up.  Next, the transcript reflects the following discussion:

> **Detective:** So you're in the car.  You stay in the car.  These guys stay in the car.  It's a lot of money to be collected.  So I mean, what's the thought, I mean, what's the thought, why is everybody, "OK."  I mean you, you, for you to just go out and randomly beat up people, that's not you.
>
> **M:** No, I didn't know until I get in the car
>
> **Detective:** Right, right.  Absolutely.  I don't dispute that.  My question is, is the fact that you stay in the car, and these other guys stay in the car.  Alright, there[']s gotta be a reason, ok.  So like you say, ya know.  What's your, what's your belief in terms of what's gonna happen.  If you help out here, somethin, it, this, I mean, its just not gonna fill any time (talking over [Sun], so [Sun] repeats . . .)
>
> **M:** If I don't, if I don't help out I'm gonna get beat up
>
> **Detective:** That if you didn't help out you'd get beat up?
>
> **M:** Yeah
>
> **Detective:** Why do you think that?
>
> **M:** Cuz . . . like . . . like if . . . like obviously they're committing something and then I'm there, I'm the witness, if I don't get like involved somewhat, I mean,
>
> **Detective:** So if you backed out?  If you backed out?
>
> **M:** Yeah, I'd get beat up
>
> **Detective:** Ok who do you think would beat you up?
>
> **M:** Like, him.  (points to picture)
>
> **Detective:** Danny [Zhu]?
>
> **M:** (nods yes)
>
> **Detective:** Ok.  Is that, is that come back to, since [Zhu] was the one that asked you, if you backed out, you're kinda aware of the situation now
>
> **M:** Cuz he's like saying all this, saying like all this stuff to me, like whys he saying all that stuff
>
> **Detective:** Ok.  Ok now does this get, now we talked about this last time, I know it's getting towards the Black Shadow stuff, is that, would that happen because you were asked to do something and if you didn't do it, that what you, that you think you'd get beat up by *Daniel*?  Danny?  It's cuz kinda the rules, the Black Shadow rules?  That type of thing?
>
> **M:** Something like that.
>
> **Detective:** Yeah?

| **M:** | (nods head yes) |
|---|---|
| **Detective:** | Yeah, ok.  Alright.  So is that, did that go through your mind, you were worried about that? |
| **M:** | Yeah (nods head yes) |

The detective then asked about the drive to Restaurant B:

| **Detective:** | Ok.  Alright, um, and then what's the conversation?  On the ride out there, what do you guys talk about? |
|---|---|
| **M:** | I was being quiet.  And they keep asking, why you so tense? |
| **Detective:** | Cuz you're scared, you're nervous |
| **M:** | Yeah |
| **Detective:** | Ok, and who keeps asking you that? |
| **M:** | Daniel [Zhu] |
| **Detective:** | Ok |
| **M:** | He said somethin like, you're gonna die today.  You didn't buy a house yet.  And he keeps laughing like… |

Once the men reached Restaurant B, Sun explained that they got out of the car and he was instructed to look for cameras.  Sun stated that he particularly was afraid of two of the men he was with:  Zhu and another man.  He confirmed that the other man had never threated him or his family nor had he asked Sun to do anything for him before, but that he generally was known to be a "bad guy."  When asked why this man had a bad reputation, Sun said that he "heard he just got out [of prison], he was in there," although Sun did not know any further details about this man's past.

Sun recounted that the men went into the restaurant, noticed the cameras, and asked a man, whom Sun understood to be the man who owed the debt (the "debtor"—presumably Victim A) to go outside.  He saw the debtor argue with one of the men he traveled with, and then the debtor started to go back into Restaurant B, and in doing so bumped into Sun, who was observing the scene on Zhu's direction.  After that, all of the men began to beat the debtor.  Sun said that the fight broke up and they all drove back toward downtown Chicago.  Sun was

dropped off at a Target store in the McKinley Park neighborhood. When asked if he talked to any of those men, including Zhu, afterwards, Sun stated that he did not talk to any of the men about the incident, but acknowledged that he later asked one of the men for a job. Sun confirmed that none of the men told him to stay quiet and no one had threatened him or his family.

### 3.     Analysis

Drawing all inferences in Sun's favor, as the Court must, the proffered transcript contains enough evidence to demonstrate the existence of a coercion issue for the jury to resolve at trial. To begin, the transcript demonstrates an evidentiary foundation for the first element of Sun's coercion defense—imminent threat of harm. Sun told the FBI agents who were interviewing him that he believed that he would be physically assaulted by Zhu and possibly other members of the Black Shadows gang if he refused to participate in the crime because he would be considered a witness. Considering the circumstances as a whole, including the threats made by Zhu during the car ride, Sun has provided enough evidence for a jury to conclude that his fear of harm was imminent, rather than "future" or "later." *Tokash*, 282 F.3d at 970 (the Seventh Circuit has repeatedly held, "'future' or 'later' and 'imminent' are opposites). According to Sun, he was in the presence of gang members from the time he got in the car until the time the crime was committed, after which his only escape from the crime scene was to get back in the same car with the same individuals. Cf. *Sawyer*, 558 F.3d at 712 (finding no imminent threat of harm where defendant did not claim that threatening individual was present at all times when she was involved with the meth ring, forcing her to act under constant compulsion). Sun's proffer also states that he will "testify that he is aware of others who did not do what they were told and they were beat and put into the hospital because of the injuries from the beating." See [259] at 3.

To be sure, much of the proffered evidence reflects a "generalized fear" of being beaten or otherwise harmed by gang members, including Zhu and the man who had recently been released from prison. A "generalized fear" of harm in the future has been found to be insufficient to meet the imminent harm element. See *Tokash*, 282 F.3d at 970 (holding that a generalized fear of bodily harm or death due to racial tension in a prison failed to pose a *prima facie* case for the imminent danger element); see also *Robinson*, 663 F.3d at 269 (general fear that corrupt police officer would plant drugs on defendant and then arrest him was inadequate to establish coercion defense); *United States v. Bonilla–Siciliano*, 643 F.3d 589, 591 (8th Cir. 2011) ("[Defendant] failed to identify any specific threat to his safety, and relied only on a generalized fear of harm from the [El Salvadorian] government and gang members, he did not make a *prima facie* showing on the first element."). At the same time, however, Sun's proffer includes a specific threat that Zhu directed at him in the car on the way to Aurora. Specifically, Sun states that Zhu told him, once or twice, that he was "gonna die today." This threat contains the type of specific details that the Government requested in briefing the issue. See [254] at 3–4 ("The defense does not state who made the threat, when during the car ride the threat was made, what the threat was, or in what manner the threat was made[.]") (citing *Sahakian*, 453 F.3d at 910); see also *Sahakian*, 453 F.3d at 910 (defendant's "fear that he *might* be assaulted at some future point by some *unidentified* inmate without any corroboration or identification of a specific assailant, is insufficient to demonstrate an entitlement to the necessity defense"). This is the type of specific threat that can support the defense. Cf. *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990) (finding that defendant's "proposed duress defense borders on the frivolous" where he "failed to present evidence of more than a generalized fear, based on the reputation of the Colombian cartels," "did not identify any * * * specific threats," and "did not proffer any

evidence that he had been in immediate danger.").  Although the transcript also indicates that Zhu was Sun's "friend" at least at some point, it still provides enough to clear the admittedly low hurdle at this stage.

Turning to the second element, Sun also has proffered enough evidence to permit a rational jury to find that he did not have a reasonable opportunity to refuse to commit the crimes. Taken as true, the proffered evidence suggests that Sun did not learn of the plan to beat someone up until he was already in the silver car.  There, he was confined with his co-defendants—either known Black Shadows gang members or a man with a bad reputation who had recently been in prison—and he was driven directly to Aurora.  The evidence shows that a rational jury could find that Sun did not have the opportunity to leave his co-defendants, to call law enforcement, or to otherwise extricate himself from participation in the crime.

In this way, Sun's case is distinguishable from many of the cases where defendants were found to have ample opportunities to extract themselves from crimes.  For example, in *Sahakian*, the defendant, an inmate in a federal maximum security prison with an alleged contract on his life, was caught carrying a metal shank.  The Seventh Circuit found that he had not proffered sufficient evidence to warrant a coercion defense instruction at trial.  As part of this analysis, the court determined that the defendant fell "far short of demonstrating that he exhausted all available lawful means of avoiding" the crime where "[h]e never informed the prison guards of the threat on his life, he did not request to be moved and he did not ask to be placed in protective custody."  453 F.3d at 911; see also *Tanner*, 941 F.2d at 588 (same).

Similarly, in *Sawyer*, the Seventh Circuit concluded that a defendant charged with drug trafficking did not lay the requisite foundation for a coercion defense where she presented evidence of "ongoing threats over the course of a year" but and did not "present evidence that

she never had the chance to contact the police in order to report [the] threats." 558 F.3d at 712; see also *United States v. Donegan*, 97 F. App'x 649, 652 (7th Cir. 2004) (defendant was not entitled to present coercion defense where she committed a series of forgeries over six years under threat and did not explain why she could not contact law enforcement during that time); *United States v. Dunkin*, 438 F.3d 778, 780 (7th Cir. 2006) (defendant's testimony did not establish coercion where bank robberies allegedly committed under duress were five years apart and defendant therefore had "ample alternatives" to committing crimes). Even shorter periods of respite have been found to disrupt the defense. See *United States v. Smith*, 151 F.3d 1031, *1 (4th Cir. June 5, 1998) (unpublished per curiam) (holding that one day between the threat and the crime provided a reasonable amount of time to escape or notify authorities, such defendant could not establish duress).

Again, accepted as true for present purposes, Sun's proffered evidence does not leave room for such options. According to the transcript, Sun did not know what was happening when he entered the silver car, and once he was inside the car, he claims to have had no "reasonable, legal alternative to violating the law." See *Bailey*, 444 U.S. at 410. Finally, the transcript also reflects that as soon as the crime was over, Sun was dropped off at a retail store and did not associate with his co-defendants again. This indicates that he ceased committing the crime as soon as he was free from the claimed duress. *Sawyer*, 558 F.3d at 711 (citing *Bailey*, 444 U.S. at 412–13).

Of course, the Court expresses no opinion on whether Sun will be successful with a coercion defense, as the inferences to be drawn from the evidence and credibility determinations are ultimately for the jury. The sole issue before the Court is whether Sun has met the low

burden of proffering sufficient evidence on each of the elements to show the existence of a coercion issue for trial.  As explained above, the Court finds that he has done so.

## IV.    The Government's *Santiago* Proffer [151]

The Court notes that on December 23, 2015, the Government filed an evidentiary proffer supporting the admissibility of coconspirator statements pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1987).  See [151].  By way of a minute entry dated June 1, 2016, the Court ordered that any responses or objections to the Government's *Santiago* proffer be filed by July 21, 2016.  See [185].  No responses have been filed or otherwise received by the Court. Accordingly, the *Santiago* proffer is accepted without objection.

## V.    Defendant Zheng's Motion to Exclude Evidence of Severity of Injuries [194]

The final issue for pre-trial resolution pertains to certain post-beating photographs of Victim A that the Government proposes to enter into evidence during trial.  Zheng acknowledges that he cannot "stipulate or admit his way out of the full evidentiary force of the Government's case" [258], at 2, but he insists that the photographs are irrelevant and thus subject to exclusion under Rule 401 or, at a minimum, so minimally relevant and so highly prejudicial as to be excludable under Rule 403.  The Government counters that the photographs are directly relevant as proof of an element of the charged crimes—namely, the use of "extortionate means," which is defined by statute as "any means which involves the use, or an express or implicit threat of use, of violence of other criminal means to cause the harm to the person, reputation, or property of another person."  18 U.S.C. § 891(7).  Zheng suggests that the surveillance video that the Government proposes to play at trial—which the Court has viewed both in the present context and previously at the sentencing of one of the co-defendants—provides sufficient evidence for

the Government to meet its burden of proving that "extortionate means" were used, and that the photographs are nothing more than highly prejudicial piling on.

Upon review of the elements of the charged offenses, the pertinent case law, the surveillance video, and the photographs themselves, the Court denies Zheng's motion. The Government correctly states its burden, and the photographs unquestionably tend to support the proposition that violence was used by the Defendants to harm Victim A. The low threshold for admissibility under Rule 401 thus is easily satisfied.

However, Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "The amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses." *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012). "[B]oth probative value and prejudice must be determined in context." *Id.* The Court concludes that the Rule 403 balance also tips in favor of admissibility. Although the surveillance video does depict a beating in progress, the video does not show the extent to which the blows hit their target or the extent of any damage that they caused—both of which are relevant to establish intent to use enough force to intimidate and cause harm to the victim for the purpose of compelling him to pay the claimed debt. In that sense, the photographs are supplemental to, not duplicative of, the video. Moreover, the photographs do not depict the kind of gruesome or horrifying images—for example, a dead body, a gunshot wound, or excessive bleeding—that would incite a jury to irrational behavior. Rather, the images show cuts and abrasions on Victim A's face, neck, and arms and a modest amount of blood on his shirt and on the ground outside the restaurant. In fact, if the jurors were shown only the video (and not the

photographs), they may even infer from the number of attackers and the location of the attack that the beating was worse than the photographs would suggest. Those inferences of course are for the jury alone to make, but adding the photographs to the full presentation of the evidence does not unfairly prejudice the Defendants in light of their clear probative value.

Finally, Zheng makes much of the quantity of photographs on the Government's exhibit list (20), suggesting that the presentation of so many photographs will be cumulative and thus a waste of the jury's time. The Court disagrees. Several of the photographs do not depict injuries at all; they show the restaurant and the general area in which the beating occurred. Other photographs show multiple views of the victim, with rulers occasionally added to give the jurors a sense of the extent of the cuts and abrasions. Each photograph appears to illustrate a point that is relevant to the issues for the jury's consideration. And, again, none of the pictures is especially gruesome and even if the Court might independently conclude that 14 or 17 pictures might suffice to make the point, the Rules of Evidence do not provide a basis for the Court to substitute its judgment for counsel's in that regard.

## VI. Conclusion

For the reasons stated above, the Court grants in part, denies in part, and reserves ruling in part on the Government's motions *in limine* [149] as follows: the Court grants the motions as to arguments directed to jury nullification and Defendants' character for lawfulness (subject to the caveats and line-drawing discussed below), denies the motion to preclude Sun's coercion defense, concluding that Sun's proffer [259] adequately demonstrates his entitlement to present the defense, and reserves ruling on the remainder of the Government's motions. The Court accepts the Government's *Santiago* proffer [151], as to which no objections have been filed. Finally, the Court denies Zheng's motion to preclude evidence of the severity of injuries [194].

Dated: August 10, 2017

Robert M. Dow, Jr.
United States District Judge